Roger A. GAUNTLETT, Petitioner,

v.

Frank J. KELLEY, Attorney General, State of Michigan, Respondent.

No. K86–447.

United States District Court, W.D. Michigan, S.D.

April 30, 1987.

William L. Fette, Kalamazoo, Mich., David Dodge, Grand Rapids, Mich., for petitioner.

Michael H. Dzialowski, Kalamazoo, Mich., for respondent.

## OPINION

ENSLEN, District Judge.

The petitioner in this case, Roger A. Gauntlett, filed a Petition for Writ of Habeas Corpus on November 12, 1986, in which he essentially requests the Court to declare illegal his sentence of September 21, 1984 and to allow him to serve a probationary sentence of five years, absent the unlawful condition that he submit to treatment with the drug Depo-Provera. Petitioner raises three grounds in support of his petition. First, he argues that prosecutorial misconduct deprived him of his due process right to a fundamentally fair sentencing. Secondly, he argues that his September 21, 1984 sentence constituted a harsher or an enhanced sentence, and that its imposition violated his right to due process of law because he had successfully appealed his sentence of January 30, 1984 and had not engaged in any conduct subsequent to such sentence that would have justified an enhanced sentence. Finally, petitioner argues that the State's decision to resentence him after he had served part of his original sentence violated his rights under the double jeopardy clause of the Fifth Amendment.

Although petitioner bases one of his claims on the specific guarantees of the double jeopardy clause of the Fifth Amendment, in essence the issue before the Court is whether the state courts' treatment of petitioner's case was fundamentally fair. In resolving that issue, I have carefully and thoroughly considered petitioner's and respondent Kelley's arguments and supporting materials. The events which precipitated the filing of this petition are distressing for a variety of reasons. The claims asserted implicate difficult issues of constitutional law. It is clear, from my exposure to the state court record, that deeply held emotions have surfaced, and that some, perhaps, are not as interested in the resolution of the legal issues as they are in the emotional overtones that accompany this controversy. I am somewhat comforted, however, that my analysis occurred in the silence of my chambers unencumbered by the sometimes shrill voices which can often be heard while reading the materials submitted.

Petitioner raises several issues that required extensive research, thought, and analysis. Indeed, although reviewing habeas petitions is among the most important of the judicial responsibilities assigned a district judge, this Court has seldom rendered more of its most precious commodity (time) than it has on its review of this petition. Several aspects of the treatment petitioner received in the state courts are troubling. The Court concludes, however, that the State did not violate any of petitioner's specific constitutional rights and that it did accord him a fundamentally fair sentencing proceeding. Therefore, I will issue an order denying his petition for a writ of habeas corpus.

### State Court Proceedings

A. The "Proposed Sentence"

On November 1, 1982 petitioner was charged, pursuant to an information, with two counts of first degree criminal sexual conduct and three counts of second degree criminal sexual conduct. The alleged victims of these offenses were petitioner's step-daughter and step-son. On July 12, 1983 petitioner entered a plea of no contest to one count of first degree criminal sexual conduct. See M.C.L. 750.520b(1)(b). In exchange for petitioner's plea, the Kalamazoo County Prosecuting Attorney's Office agreed to dismiss the remaining charges against petitioner at the time of sentencing. Sentencing was scheduled for August 18, 1983 before Judge Fitzgerald of the Kalamazoo County Circuit Court, but was adjourned at petitioner's request and rescheduled for October 18, 1983.

On October 18 petitioner, his counsel, and an assistant prosecuting attorney met with Judge Fitzgerald in his chambers for a "presentence conference." Petitioner's counsel, who also served as petitioner's defense counsel in the state court proceedings, has filed an affidavit (which the Court accepts as accurate) indicating that at this conference, Judge Fitzgerald proposed, or announced his intention to impose, a proba-

tionary sentence of five years with the following conditions: (1) petitioner was to serve the first year of his probation at the Kalamazoo County Jail; (2) petitioner was to make restitution to the victim and to pay court costs; (3) petitioner was to pay counseling fees for the victim of his crime; and (4) petitioner was to make "a significant and meaningful contribution of funds sufficient for the initial establishment of a program independent of the Courts for identification, treatment and prevention of child sexual abuse within Kalamazoo County." Affidavit of William L. Fette, ¶ 4. Judge Fitzgerald adjourned the sentencing, apparently at petitioner's request and over the objection of the assistant prosecuting attorney, until December 5, 1983 to allow petitioner time to see if he would be able to meet the conditions of his proposed probation. Judge Fitzgerald also informed the parties, both in chambers and on the record, that the matters discussed in his chambers were " 'not a matter of public record and should be kept as such.' " *See People v. Gauntlett (Gauntlett I)*, 134 Mich.App. 737, 741, 352 N.W.2d 310, *modified*, 419 Mich. 909, 353 N.W.2d 463 (1984).

Despite Judge Fitzgerald's admonition, the assistant prosecuting attorney informed the victim's father of the proposed sentence. Petitioner alleges that the assistant prosecuting attorney also informed the father that the presentence investigator had recommended a minimum sentence of fifteen years, even though this information also was to be kept confidential. The father immediately notified the news media of Judge Fitzgerald's proposal or recommended sentence, and the media in turn widely disseminated the information, particularly in Kalamazoo County. It is obvious, and the Court has no doubt, that the assistant prosecuting attorney's release of the information concerning Judge Fitzgerald's proposed sentence to the victims' father was a direct cause of the extensive publicity that surrounded petitioner's sentencing. Respondent has not rebutted petitioner's counsel's statement that there was little media interest in the case prior to October 18, 1983. See Fette Affidavit, ¶ 11.

### B. *The Judges' Grievance, and the Resulting Disqualifications*

Shortly after the assistant prosecuting attorney's action, the Judges on the Kalamazoo County Circuit Court filed a joint grievance with the State Bar Grievance Committee requesting the committee to investigate that attorney's action. On November 16, 1983 the assistant prosecuting attorney filed a motion to disqualify Judge Fitzgerald from the case. He raised two grounds in support of his motion: (1) that in an unrelated case involving the assistant prosecuting attorney, Judge Fitzgerald had disqualified himself and had granted a mistrial; and (2) that Judge Fitzgerald was a party to the grievance the Circuit Court Judges had filed against the attorney. That same day, concurrent with the filing of this motion (but independent of it), Judge Fitzgerald *sua sponte* decided to disqualify himself from further participation in the case.

The case then was assigned to Judge Lamb of the same court. On November 23, 1983 the assistant prosecuting attorney filed a motion to disqualify Judge Lamb, again arguing that disqualification was proper because Judge Lamb had filed a grievance against the attorney. On January 3, 1984 petitioner filed a motion to disqualify the assistant prosecuting attorney, arguing that "the interests of justice and the equal protection and due process claims (sic) of the State and Federal Constitutions" required such action. On January 20, 1984 the assistant prosecuting attorney withdrew his motion to disqualify Judge Lamb and himself withdrew from the case. Nevertheless, on January 25, 1984 Judge Lamb *sua sponte* disqualified himself from the case, finding that his "professional and judicial ethics and ... conscience" demanded that he withdraw from the proceeding.

### C. *The Depo-Provera Sentence*

The case then was assigned to Judge Borsos, who also was a Judge on the Kalamazoo County Circuit Court, on January 25, 1984. On Thursday, January 26, Judge Borsos, on his motion, decided not to disqualify himself and scheduled sentencing for January 30. On January 27 petitioner filed a motion requesting that Judge Bor-

sos either impose the sentence Judge Fitzgerald had announced in his chambers on October 18, 1983 or impose a different sentence that would be no harsher than such proposed sentence. Alternatively, petitioner requested a postponement in sentencing so that he could study the new presentence report and so he could respond to as yet unknown information Judge Borsos had given the parties in sealed white envelopes on January 27, in chambers, but had forbidden them to examine until January 28.

On January 28 petitioner opened his envelope and discovered that Judge Borsos may be considering a sentence that would require petitioner to take the drug Depo-Provera, which is an experimental medication that some researchers had been using to treat male sex offenders because it "lowers the level of testosterone, reduces the sex drive, and in most instances causes temporary impotence." *Gauntlett I*, 134 Mich.App. at 748, 352 N.W.2d 310. On January 30, 1984 petitioner filed a motion requesting Judge Borsos to reconsider his decision not to disqualify himself from the case. Also on January 30, the prosecuting attorney filed a motion to disqualify Judge Borsos. At petitioner's sentencing, Judge Borsos denied both parties' disqualification motions. He also denied petitioner's motion to impose Judge Fitzgerald's proposed sentence. The prosecuting attorney then filed a written motion requesting Judge Borsos to refer the disqualification issue to the Chief Judge of the Court. See M.C.R. 2.003(C)(3)(a).

Judge Borsos also denied that motion. At that point, the prosecuting attorney declined to participate further in the sentencing, arguing that the court lacked jurisdiction over the matter because it had refused to refer the disqualification issue to the Chief Judge. The prosecuting attorney also stated, however, that "[i]f the Court sentence[d] ... Defendant in a manner consistent with [the attorney's] conception of justice for the crime that [defendant] committed, then" he probably would not appeal the Court's denial of his motion. Transcript of January 30, 1984 Hearing at 62–63.

Judge Borsos proceeded to sentence defendant to a five-year term of probation. He imposed three special conditions of the probation: (1) petitioner was to serve the first year of his probation at the Kalamazoo County Jail; (2) petitioner was to pay court costs of $25,000; and (3) petitioner was to submit himself "to castration by chemical means patterned after the research and treatment of the Johns Hopkins Hospital in Baltimore, Maryland, and continue same for the five years of" his probation. *Id.* at 89. Judge Borsos reserved the right to award restitution in favor of the victim at a later date. *Id.* He in addition informed defendant that failure to carry out the terms of his probation would constitute a violation of such probation and would "likely lead to a prison sentence similar to those" Judge Borsos had imposed in the past for similar offenses. *Id.* at 90. Judge Borsos denied petitioner's motion for post-conviction bond and committed him to the custody of the Sheriff's Department.

Following the sentencing, the prosecuting attorney refused to adhere to the plea agreement and to dismiss the remaining four charges against defendant. Petitioner thus filed a motion to enforce the plea bargain, and Judge Borsos conducted a hearing on it on February 6, 1984. Judge Borsos did not rule on petitioner's motion at the hearing, but rather took the opportunity to amend his Order of Probation to clarify that if petitioner was, for any reason, unable to submit to treatment with Depo-Provera, then the entire sentence of probation would be set aside and petitioner would be resentenced. On February 13, 1984 petitioner appealed Judge Borsos' sentence and requested the Court of Appeals to stay the term of probation requiring chemical castration. On February 28 the Court of Appeals granted petitioner's request for a stay and established an expedited briefing schedule for the appeal. On March 5, 1984 Judge Borsos did enter an order dismissing the other four counts against petitioner.

### D. *The First State Court of Appeals—Gauntlett I*

Petitioner raised seven grounds in support of his appeal: (1) that the condition

that he serve one year of his probation in the County Jail was arbitrary and unlawful; (2) that the condition requiring chemical castration was unconstitutional; (3) that the unlawful conditions of probation should be stricken from the Probation Order; (4) that Judge Borsos' February 6, 1984 amendment of his Order of Probation was unlawful; (5) that because of prosecutorial misconduct, it was unlawful to sentence petitioner to any term of imprisonment or condition of probation more severe than Judge Fitzgerald's proposed sentence; (6) that Judge Borsos did not err in failing to refer the prosecuting attorney's motion to disqualify to the Chief Judge, and that in any event any error he may have committed was harmless; and (7) that the prosecuting attorney could not appeal the conditions of probation, or alternatively that Judge Borsos' decision to sentence petitioner to a term of probation was not an abuse of discretion.

The Court of Appeals issued its decision on May 17, 1984. The court agreed that the "chemical castration" condition of probation was unlawful and reversed Judge Borsos' sentence on that point. It rejected petitioner's contention, however, that it should simply strike the unlawful condition of probation and otherwise allow petitioner to serve his sentence. It found that since petitioner had also challenged the condition that he serve one year in the Kalamazoo County Jail, he had effectively opened his full sentence to appellate review. *Gauntlett I*, 134 Mich.App. at 753–54, 352 N.W.2d 310; *see People v. Coles*, 417 Mich. 523, 339 N.W.2d 440 (1983). The Court of Appeals further found that Judge Borsos had abused his discretion in sentencing petitioner to a probationary sentence, and remanded for resentencing. It also decided that resentencing petitioner would not violate his protection against double jeopardy; that Judge Borsos should be removed from the case and that the Court Administrator should appoint a different judge to resentence petitioner; and that the prosecuting attorney had not engaged in any misconduct that would require the court to limit the sentence a judge could impose on resentencing.

Petitioner thereafter carried his appeal to the Michigan Supreme Court. He argued in support of this appeal, among other things, that imposing a harsher sentence on resentencing would violate his rights under the due process clause of the Fourteenth Amendment; that such a sentence also would violate his rights under the double jeopardy clause of the Fifth Amendment, as applied to the states through the Fourteenth Amendment; and that the Court of Appeals had erred in holding that petitioner's probationary sentence shocked its conscience and in vacating the sentence.

On August 24, 1984 the Michigan Supreme Court issued a short order modifying the Court of Appeals' decision. The Supreme Court held that once it had invalidated the Depo-Provera condition of petitioner's probation, the Court of Appeals should have "remanded the case, without further direction, to the Kalamazoo Circuit Court for resentencing." *People v. Gauntlett*, 419 Mich. 909, 353 N.W.2d 463 (1984). That Court accordingly remanded the matter "to the trial court for resentencing by the visiting judge assigned to do so without further direction." *Id.*

### E. *The Incarceration Sentence*

Judge Jack W. Warren was assigned to handle petitioner's resentencing. On September 14, 1984 Judge Warren conducted a hearing at which he denied a number of motions filed by petitioner. At that hearing, petitioner raised the issue that imposition of an enhanced sentence would violate his rights under the due process clause of the Fourteenth Amendment. He also argued that to resentence him to a harsher sentence would violate his rights under the double jeopardy clause. Judge Warren took plaintiff's arguments under advisement at the September 14th hearing. He rejected them at petitioner's September 21, 1984 resentencing. Judge Warren reasoned, in part, that the Michigan Supreme Court had implicitly rejected petitioner's arguments when it remanded the case for resentencing rather than simply striking the unlawful condition of probation, and that the *Pearce* presumption of vindictiveness, which I will discuss later in this opin-

ion, did not apply. He sentenced petitioner to a term of five (5) to fifteen (15) years imprisonment, with credit for time served. Judge Warren granted petitioner's motion for release on bond pending appeal.

### F. *The Second State Court Appeal: Gauntlett II*

Petitioner appealed this sentence to the Michigan Court of Appeals, arguing that the sentence violated his rights under the due process clause because it was harsher than his first sentence; that to resentence him after he had commenced service of his first sentence violated his rights under the double jeopardy clause; and that prosecutorial misconduct had rendered his sentencing(s) invalid. The Court of Appeals rejected these arguments. It rejected petitioner's due process and double jeopardy claims because Judge Borsos' sentence was invalid and void, legally "never existed," and thus could not "provide defendant with a benchmark for comparing and attacking Judge Warren's sentence." *People v. Gauntlett (Gauntlett II)*, 152 Mich.App. 397, 401, 394 N.W.2d 437 (1986). The court also rejected petitioner's claim of prosecutorial misconduct. The Michigan Supreme Court subsequently denied petitioner's request for leave to appeal. In his application for leave to appeal, petitioner had, among other issues, renewed his claims that Judge Warren's sentence violated his due process rights and that prosecutorial misconduct had deprived him of his right to a fair and impartial sentencing. Petitioner did not, however, explicitly raise his double jeopardy claim.

Petitioner then filed his petition for a writ of habeas corpus in this Court raising the three issues set forth on page one. He also filed a motion for a stay of execution of his sentence or for release on bond pending the Court's decision on his habeas petition. The Court held a hearing on January 5, 1987 at which it denied petitioner's request for ·release on bond. By that time, Judge Warren had revoked petitioner's bond and had remanded him to the custody of the Michigan Department of Corrections. At the January 5th hearing the Court instructed the parties to address a number of issues in their briefs. Respon-

dent's brief was filed on January 29, and petitioner filed a supplemental brief on February 10.

### Discussion

The Court has discussed the state court proceedings in this case in detail because petitioner's claims are largely based on what occurred in those proceedings. I will discuss petitioner's claims by addressing issues 2, 3, and 1 in that order. Before doing so, however, I address respondent's argument that petitioner has failed to exhaust his state court remedies.

### The Failure to Exhaust Argument

■ Respondent argues that petitioner did not present his double jeopardy claim to the state courts, and concludes that the Court accordingly should dismiss his petition. *See Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). As respondent argues, the Court can consider only those issues that petitioner has fairly presented to the state courts for decision. *Sampson v. Love*, 782 F.2d 53, 55 (6th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 159, 93 L.Ed.2d 98 (1986). Unless petitioner has " 'fairly presented' to the state court[s] the 'substance' of his federal claims," I must dismiss his petition. *Haggins v. Warden*, 715 F.2d 1050, 1054 (6th Cir.1983) (*quoting Picard v. Connor*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)). "The purpose of the exhaustion requirement is 'to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings.' " *Sampson*, 782 F.2d at 55, *quoting Rose*, 455 U.S. at 518, 102 S.Ct. at 1203. As a corollary principle to the exhaustion requirement, the Supreme Court has held that a federal court must dismiss habeas petitions that present both exhausted and unexhausted claims. *Id.* at 522, 102 S.Ct. at 1205.

■ I stated earlier in this opinion that petitioner did not explicitly raise his double jeopardy claim on his second appeal to the Michigan Supreme Court. I nevertheless find that petitioner has fairly presented his double jeopardy claim to the Michigan state courts. As petitioner argues, he presented his claim to the Michigan Court of Appeals

on his first appeal; to the Michigan Supreme Court on his first appeal; to Judge Warren on his resentencing; and to the Michigan Court of Appeals on his second appeal. Petitioner's only error, if there be one, was that he did not explicitly raise the issue again before the Michigan Supreme Court. Petitioner is not required to raise his claims repeatedly before the Michigan courts, and I believe that he has adequately exhausted his claim here. *See Elmore v. Foltz,* 768 F.2d 773, 775–76 (6th Cir.1985). Since the Michigan Supreme Court rejected petitioner's claim once, I find that he was not required to present it to that court again.

### A. *Due Process Violation*

Petitioner predicates his first argument on the Supreme Court's decision in *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), in which the Court addressed the issue of whether a criminal defendant who has successfully appealed his conviction may, upon being reconvicted for his offense, receive a harsher sentence. The Supreme Court decided in *Pearce* that "the guarantee against double jeopardy imposes no restrictions upon the length of a sentence imposed upon reconviction," although it does require that the defendant be given full credit for any punishment "already exacted for" the offense. *Id.* at 718–19, 89 S.Ct. at 2077–78. It similarly found that the equal protection clause does not "absolutely forbid[ ] the imposition of a more severe sentence upon retrial." *Id.* at 722, 89 S.Ct. at 2079.

The Supreme Court did find, however, that the due process clause limits a state's authority to impose a harsher sentence upon reconviction. It observed that "[i]t can hardly be doubted that it would be a flagrant violation of the Fourteenth Amendment for a state trial court to follow an announced practice of imposing a heavier sentence upon every reconvicted defendant for the explicit purpose of punishing the defendant for his having succeeded in getting his original conviction set aside." *Id.* at 723–24, 89 S.Ct. at 2079–80. The Court thus concluded that due process of law "requires that vindictiveness against a defendant for having successfully attacked

his first conviction must play no part in the sentence he receives after a new trial." *Id.* at 725, 89 S.Ct. at 2080.

■ The Court went on to hold, moreover, that "since the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right to appeal or collaterally attack his first conviction, due process also requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge." *Id.* To effectuate this latter holding, the Court established a broad prophylactic rule:

> In order to assure the absence of such a motivation, we have concluded that whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear. Those reasons must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding. And the factual data upon which the increased sentence is based must be part of the record, so that the constitutional legitimacy of the increased sentence may be fully reviewed on appeal.

*Id.* at 726, 89 S.Ct. at 2081; *see also Wasman v. United States,* 468 U.S. 559, 572, 104 S.Ct. 3217, 3224–25, 82 L.Ed.2d 424 (1984) ("after retrial and conviction following a defendant's successful appeal, a sentencing authority may justify an increased sentence by affirmatively identifying relevant conduct or events that occurred subsequent to the original sentencing proceedings"). In situations where this prophylactic rule does not apply, moreover, a defendant still may succeed on his due process claim by establishing that the sentencing authority actually was vindictive toward him because he had exercised his right of appeal. *Id.* at 569 (plurality opinion); *see Texas v. McCullough,* 475 U.S. 134, ——, 106 S.Ct. 976, 979, 89 L.Ed.2d 104, 111 (1986). I note that I agree with petitioner that the *Pearce* standard applies in this case even though petitioner challenged only his sentence, and not the underlying convic-

tion or plea, on appeal. *See United States v. Jefferson*, 760 F.2d 821, 825 (7th Cir.), *vacated and remanded on other grounds*, — U.S. ——, 106 S.Ct. 41, 88 L.Ed.2d 34 (1985), *on remand*, 782 F.2d 697 (7th Cir. 1986).

Petitioner argues that under *Pearce* and its progeny, Judge Warren erred in imposing a sentence that was more severe than the one Judge Borsos had imposed. He suggests that since Judge Warren failed to identify any conduct or events occurring subsequent to the original sentencing proceeding that would have justified a harsher sentence, and in fact assumed that defendant's conduct in the County Jail had been exemplary (Transcript of September 21, 1984 Sentencing at 16), *Pearce*'s *per se* rule requires this Court to invalidate Judge Warren's sentence. Petitioner also argues that even if the *per se* rule does not apply, the record adequately supports an inference of actual vindictiveness that likewise gives this Court reason to invalidate Judge Warren's sentence.

Respondent makes three arguments in response to petitioner's claim. First, he argues that the Court should follow the Michigan Court of Appeals' ruling that since Judge Borsos' sentence legally never existed, it cannot provide "a bench mark for comparing and attacking Judge Warren's sentence." *Gauntlett II*, 152 Mich. App. at 401, 394 N.W.2d 437. Secondly, respondent argues that the *Pearce* presumption does not apply in this case. He observes that since Judge Warren did not sentence petitioner the first time there is no reason to assume that his sentence was vindictive. Finally, he argues that there is no factual basis for inferring that Judge Warren's sentence actually was vindictive.

■ The Court has conducted extensive research on petitioner's due process claim. Initially, I reject respondent's argument, and the Michigan Court of Appeals' holding, that the *Pearce* due process rule does not apply because Judge Borsos' sentence was invalid and thus cannot provide a basis for comparison. Judge Brosos' sentence may well have been invalid and void under Michigan law. I need not address that issue, however, and indeed probably cannot because I am bound by the Michigan

courts' determinations of state law, because I believe that it is irrelevant to petitioner's claim. The fallacy of respondent's argument can be demonstrated in two ways. First, regardless of whether the state courts eventually found Judge Borsos' sentence to be invalid and void, it was imposed and petitioner did serve a substantial period of time in the County Jail under it. Presumably, moreover, the sentence would still be in effect if neither party had challenged it. It defies logic to argue that Judge Borsos' sentence never existed and thus cannot provide a benchmark for comparing Judge Warren's sentence. Secondly, and more importantly, courts have applied the *Pearce* doctrine where an illegal sentence has been vacated and the case remanded for resentencing. *See United States v. Colunga*, 812 F.2d 196, 199–200 (5th Cir.1987); *United States v. Bello*, 767 F.2d 1065, 1067–69 (4th Cir.1985); *United States v. Moore*, 710 F.2d 270 (6th Cir. 1983). Similarly, in this case the Michigan courts determined that petitioner's first sentence *was* illegal and remanded the matter for resentencing.

■ Having said this, I find that I should reject petitioner's claim for two reasons: First, I do not believe I can sufficiently compare the two sentences petitioner received to conclude that the second was harsher than the first, or otherwise constituted an enhanced sentence. As the Court of Appeals for the Second Circuit has indicated, it often is difficult, if not impossible, to compare different kinds of sentences. *United States v. Barash*, 428 F.2d 328, 331–32 (2d Cir.1970); *see Jefferson*, 760 F.2d at 827. The Second Circuit solved this problem by exercising its supervisory authority to hold that "after retrial, a sentencing judge is bound, absent the justifying circumstances set out in *Pearce* ..., to follow the kind, as well as to stay within the bounds of the degree of severity, of the punishment imposed following the first trial." *Barash*, 428 F.2d at 332. I cannot, of course, exercise that kind of supervisory authority over the state courts in this case. I do not, moreover, believe it was unconstitutional for Judge Warren to impose a different kind of sentence on petitioner; that

he did so simply makes my task more difficult.

In comparing petitioner's first and second sentences, I cannot say that the second one was harsher than the first. True, the second sentence requires petitioner to serve a substantial term of incarceration whereas the first required him to serve only one year in the County Jail. Under the "second" sentence, however, petitioner is not required to take Depo-Provera. I do not know how I can compare having to take Depo-Provera with having to serve a substantial period of incarceration. Both constitute substantial limitations on petitioner's liberty. One could argue that the difference is that requiring petitioner to take Depo-Provera clearly is illegal, whereas a term of incarceration is not; and that the Court should focus only on whether a term of incarceration is a harsher sentence than a term of probation. Yet I do not believe I can consider Judge Borsos' decision to place petitioner on probation apart from the conditions he imposed on that probation. Given those conditions, and in particular the condition that petitioner submit to treatment by Depo-Provera, I cannot say that petitioner's second sentence was harsher than his first.[1]

Secondly, and more importantly, even if I were to find that petitioner's second sentence constituted a harsher or an enhanced sentence, I have no basis for finding either that *Pearce*'s prophylactic rule applies or that petitioner's second sentence was the result of actual vindictiveness toward him. I will first discuss whether, as petitioner argues, *Pearce* prevented Judge Warren from imposing a harsher sentence on petitioner absent some identifiable conduct or event occurring since the first sentencing proceeding that would have justified such a sentence.

In *Texas v. McCullough*, the Supreme Court made it clear that *Pearce*'s presumption of vindictiveness does not always apply when a defendant has successfully challenged his conviction or his sentence and faces resentencing. The Court stated, rather, that the presumption is restricted "to areas where its 'objectives are thought most efficaciously served'" and that courts accordingly should, "in each case, ... look to the need, under the circumstances, to 'guard against vindictiveness in the resentencing process.'" *McCullough*, 475 U.S. at ——, 106 S.Ct. at 978, 89 L.Ed.2d at 110 (citations omitted). In particular, the Court—extending its holding in *Chaffin v. Stynchcombe*, 412 U.S. 17, 35, 93 S.Ct. 1977, 1986–87, 36 L.Ed.2d 714 (1973), that the *Pearce* presumption does not apply in jury sentencing when a *different jury* does the resentencing and "is not informed of the prior sentence"—indicated that the presumption will rarely, if ever, apply when different sentencers are involved on the original sentencing and on the resentencing.

The presumption is also inapplicable because different sentencers assessed the varying sentences that McCullough received. In such circumstances, a sentence 'increase' cannot truly be said to have taken place.... Here, the second sentencer provides an on-the-record, wholly logical, nonvindictive reason for the sentence. We read Pearce to require no more particularly since trial judges must be accorded broad discretion in sentencing....

*McCullough*, 475 U.S. at ——, 106 S.Ct. at 980, 89 L.Ed.2d at 112; *see also United States v. Lippert*, 740 F.2d 457, 460 (6th Cir.1984) ("where a different judge or a different jury impose a harsher sentence after an earlier conviction has been set aside, the possibility of vindictiveness is

---

1. Does not "enhancement" in the context of the due process and double jeopardy arguments really beg the question? Is probation really less severe than incarceration? Is contributing thousands or millions to a crisis center less severe than incarceration? Is "chemical castration" more/less severe than a prison sentence? Does one count the years of probation versus the years of an incarceration sentence in considering "enhancement"? Is more time in a coun-

ty jail the equivalent of less (or more) time in a state prison? "Enhancement" is easy to define when one considers two years versus four years, or a probation sentence without special terms, as opposed to a probation sentence with special terms. The point is that apples really are not oranges ... and the sentences proposed and imposed here are virtually incapable of comparison.

remote"), *cert. denied,* 469 U.S. 1218, 105 S.Ct. 1200, 84 L.Ed.2d 344 (1985); *Brown v. District Court,* 637 F.Supp. 1096, 1099 (E.D.N.Y.1986) (indicating the *Pearce* presumption does not apply where an appellate court imposes the new sentence).

Petitioner argues vigorously that the *Pearce* presumption of vindictiveness applies in this case even though a different Judge conducted the resentencing, particularly since the second Judge was well aware of the history of the case and of the extensive publicity surrounding it. Were I free to do so, I might agree with petitioner's contentions. *See United States v. Hawthorne,* 532 F.2d 318, 323 (3d Cir.1976) (applying the *Pearce* presumption even though the second judge had "consciously sought to insulate himself from knowledge of the prior proceedings"); *People v. Jones,* 403 Mich. 527, 271 N.W.2d 515 (1978) (holding that resentencing before a different Judge does not vitiate the *Pearce* presumption). I am, however, bound by the Supreme Court's decision in *McCullough,* and do not see any means of distinguishing that decision from the facts of this case. Like the second sentencer in *McCullough,* the second sentencing Judge in this case gave "on-the-record, wholly logical, nonvindictive reason[s]" for his sentence. Since this is not the kind of case in which the Supreme Court has indicated that the *Pearce* presumption should apply, I will decline to invoke it.

■ I still must address the issue of whether petitioner has shown that vindictiveness for his having exercised his right of appeal actually played a part in his resentencing. I have reviewed the transcript of Judge Warren's sentencing, as well as the other parts of this file, and reject petitioner's contention. Petitioner points out that many of the actions taken "by the appellate Courts were irregular and unusual" and that his case was handled "differently" than other cases. Petitioner's ar-

gument may well have an element of truth, but I see little, if any, evidence that Judge Warren was actually vindictive toward the petitioner. He was a visiting judge, from outside the County, who apparently was shielded from the publicity surrounding petitioner's case. Judge Warren obviously thought that petitioner deserved to be incarcerated as opposed to being given a probationary sentence. Yet I have no evidence that he based his decision on anything other than legitimate sentencing considerations.[2]

In summary, I appreciate the basis for petitioner's due process concerns. I find, however, no reason either for invoking the *Pearce* presumption or for holding that petitioner's second sentence was a punishment for his decision to appeal his first sentence. I therefore deny petitioner's due process claim.

### B. *Double Jeopardy Violation*

Petitioner also argues that Judge Warren's sentence violated his rights under the double jeopardy clause of the Fifth Amendment, which applies to the states. *Benton v. Maryland,* 395 U.S. 784, 795–96, 89 S.Ct. 2056, 2063, 23 L.Ed.2d 707 (1969). Petitioner observes that he had served a substantial portion of Judge Borsos' sentence before his resentencing, and urges that since he had done so, the Michigan courts were precluded from enhancing that sentence. Respondent argues that the Supreme Court's decision in *United States v. DiFrancesco,* 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980), precludes this claim.

Prior to *DiFrancesco,* I probably would have agreed with petitioner's claim because federal courts had long held that "the Double Jeopardy Clause prevents a sentence from being increased after a defendant has begun to serve it." *Bello,* 767 F.2d at 1069; *see also United States v. Matlock,* 491 F.2d 504, 506–07 (6th Cir.1974) (holding that a "District Court cannot increase a

---

**2.** I am a firm believer in an independent judiciary—a group of individuals removed from the hue and cry of the public. And for all the reasons utilized by the Constitution drafters, and from the debate addressed, in part, by the Federalist papers. Judge Warren, from outside the debate area, and not a candidate for re-elec-

tion, comes as close as a Michigan State Judge can, to being immune from threats by lawyers or the body politic. The Michigan system of selecting judges, and retaining them, is, as all know, inapposite to trying to create an independent and hence, impartial judiciary. Judge Warren, because of his status, is the exception.

sentence after the defendant has started to serve it even though the increase merely carries out the intention of the court at the time of the original sentence"). In *DiFrancesco*, however, the Supreme Court considered the constitutionality, under the double jeopardy clause, of a statute that allows the United States to appeal a criminal sentence under certain circumstances. The Court upheld the statute's validity, holding in part that a "criminal sentence, once pronounced, is [not] to be accorded constitutional finality and conclusiveness similar to that which attaches to a jury's verdict of acquittal." *DiFrancesco*, 449 U.S. at 132, 101 S.Ct. at 434–35; *see also id.*, at 134, 101 S.Ct. at 436 (noting that its prior decisions "clearly establish that a sentence does not have the qualities of constitutional finality that attend an acquittal"). The Supreme Court indicated, rather, that a court must examine the defendant's legitimate expectation in the finality of his sentence in deciding whether double jeopardy concerns are implicated on resentencing. *See id.*, at 136–38, 101 S.Ct. at 437–38.

The courts of appeals that have considered double jeopardy claims in sentencing since *DiFrancesco* accordingly have almost uniformly examined the legitimacy of the defendant's claimed expectation of finality in his sentence. They have held that even though the Supreme Court stated in *DiFrancesco* that it was venturing "no comment" as to the rule that a court may not increase a defendant's sentence once he has begun to serve it, *id.* at 134, 101 S.Ct. at 435–36, "the reasoning of Justice Blackmun's opinion for the majority went beyond the specific facts of the case, undercutting the basis for any general rule that the Double Jeopardy Clause precludes a sentence increase once the defendant has commenced serving the sentence." *Bello*, 767 F.2d at 1069; *see Colunga*, 812 F.2d at 198; *McClain v. United States*, 676 F.2d 915, 917–18 (2d Cir.1982). These courts have, instead, held that they must look "to whether the defendant had a legitimate expectation of finality as to the severity of his sentence in order to determine whether an increase in the sentence is essentially a multiple punishment for the same offense." *Bello*, 767 F.2d at 1070. They have con-

sidered the following principles in deciding whether the defendant had the requisite expectation of finality:

—A legitimate expectation of finality arises, and jeopardy attaches, when the defendant has completed service of the sentence. *United States v. Arrellanos-Rios*, 799 F.2d 520, 524 (9th Cir.1986).

—A defendant does not have a legitimate expectation of finality when he is sentenced under a statute that explicitly provides for modification of the sentence on appeal. *DiFrancesco*, 449 U.S. at 137, 101 S.Ct. at 437–38; *see Pennsylvania v. Goldhammer*, 474 U.S. 28, 106 S.Ct. 353, 88 L.Ed.2d 183 (1985).

—A defendant who has deliberately misled the sentencer or otherwise thwarted the sentencing process cannot claim a legitimate expectation of finality. *United States v. Jones*, 722 F.2d 632, 638–39 (11th Cir.1983).

—A defendant who has received an illegal sentence that is subject to correction, or who has been sentenced in an illegal manner that is subject to correction, cannot claim a legitimate expectation of finality. *United States v. Crawford*, 769 F.2d 253, 257 (5th Cir.1985); *Arrellanos-Rios*, 799 F.2d at 524. (Note the corollary to the instant case.)

—A defendant who has appealed his sentence, and thus has sought to "nullify the sentencing plan," generally cannot claim a legitimate expectation of finality. *Colunga*, 812 F.2d at 198; *see Bello*, 767 F.2d at 1070. (Another corollary.)

—A sentence may not be enhanced "after the defendant has served so much of his sentence that his expectations as to its finality have crystalized and it would be fundamentally unfair to defeat them." *United States v. Lundien*, 769 F.2d 981, 987 (4th Cir.1985).

■ These principles are not, of course, exhaustive. But I think they adequately illustrate the nature of my inquiry. Having examined the record in this case, I do not believe that petitioner can claim an expectation in the finality of Judge Borsos' sentence sufficient to have precluded or limited Judge Warren's sentencing perogatives.

I agree with petitioner that there are many distinguishing features to this case, and that this situation does not fall neatly under any of the cases I have discussed or researched. I find, however, that the following factors prevented petitioner from having a legitimate expectation in the finality of his sentence: Initially, petitioner appealed his first sentence. He argues that this does not foreclose his claim because he appealed only two of the conditions of his probation, and not the underlying probationary sentence. The state courts have held, however, that petitioner, in effect, appealed his entire sentence and I am in no position to dispute that finding. Secondly, Judge Borsos indicated, subsequent to petitioner's sentencing, that if for any reason petitioner were unable to comply with the conditions of probation, he should be sentenced to a term of incarceration. Petitioner argues that Judge Borsos' attempt to amend his sentence was invalid as a matter of state law. That may be true, but I believe it still indicated to petitioner that a term of incarceration was a likely alternative sentence. Finally, petitioner did not serve so much of Judge Borsos' sentence that his expectation as to its finality would have "crystalized."

In summary, I reject petitioner's argument that Judge Warren's sentence is invalid under the double jeopardy clause. That petitioner had begun service of his "first" sentence clearly did not bar resentencing. He did not, moreover, have a legitimate expectation in the finality of his first sentence that would have limited his second sentence. Petitioner received credit for time served on his first sentence, which is all the double jeopardy clause requires in this context. *Colunga*, 812 F.2d at 199.

### C. *Prosecutorial Misconduct*

The final argument I will consider, and the most troubling one, is petitioner's argument that subsequent to Judge Fitzgerald's announcement of his proposed sentence in chambers on October 18, 1983, the prosecuting attorney's office engaged in a deliberate pattern of misconduct intended to deter the Circuit Court Judges from imposing a sentence of probation and to ensure that they imposed what the prosecuting attorney considered to be "a proper sentence." Prior to the assistant prosecuting attorney's disclosure of Judge Fitzgerald's proposed sentence to the victim's father—and the subsequent dissemination of that information, as well as portions of the presentence report, to the public—there was little, if any, public interest in petitioner's case.[3] Subsequent to the assistant prosecuting attorney's breach of Judge Fitzgerald's order of confidentiality, a significant amount of publicity about the case ensued. Petitioner argues that the prosecuting attorney's office encouraged this publicity, took direct advantage of it in court proceedings, and eventually succeeded in its goal of having petitioner sentenced to a substantial term of imprisonment.

Petitioner argues, in particular, that the following actions by the prosecuting attorney constituted grave prosecutorial misconduct that deprived him of his due process right to a fundamentally fair and impartial sentencing: First and foremost, the assistant prosecuting attorney breached Judge Fitzgerald's October 18, 1983 order of confidentiality concerning the proposed sentence and triggered a flood of publicity about the case. Petitioner argues that even though the assistant prosecuting attorney may not have directly communicated Judge Fitzgerald's proposed sentence and contents of the presentence report to the news media, he clearly was negligent in failing to ensure that the victim's father did not communicate this information to other persons.[4]

---

**3.** Indeed, on the scheduled day of sentence (called sometimes in the record a pre-sentence conference), there appears to have been a single person present in the courtroom—a newspaper reporter. The public, therefore, had no apparent interest in the proceedings even on the day scheduled for sentence, and the record is largely silent as to what publicity or notoriety had attended the matter prior to this date.

**4.** The record is unclear and, even on re-hearing would probably remain unclear. Did the State lawyer "urge" media exposure? Suggest it? What could have been his "motive"? Certainly *not* to communicate to his "client". His client

Secondly, petitioner argues that the assistant prosecuting attorney compounded his error by filing a motion to disqualify Judge Fitzgerald. Although this motion had a facially valid basis, *i.e.*, that Judge Fitzgerald had filed a grievance against the attorney, petitioner argues that the attorney's clear intent was to remove Judge Fitzgerald from the case because of the sentence he intended to impose on petitioner and to intimidate the other Judges on the court. Petitioner notes that the attorney continued to practice in front of the Circuit Court Judges on other cases even though they had filed a grievance against him, and that Judge Fitzgerald had disqualified himself on his own motion because the "extensive media coverage and comment, including lead articles, editorials and letters to the editor, as well as an orchestrated letter writing and telephone call campaign" concerning petitioner's sentencing had rendered it impossible for him to impose "an impartial and independent sentence." Transcript of November 16, 1983 Opinion at 6.

Petitioner argues that the prosecuting attorney aggravated the situation, and continued his campaign to intimidate the Circuit Court Judges, by promptly moving to disqualify the next Judge, Judge Lamb, who was assigned the case. Again the prosecuting attorney based his motion to disqualify on the fact that Judge Lamb had filed a grievance against him. Petitioner notes, however, that the attorney apparently was content to continue to appear before Judge Lamb on other cases. Judge Lamb, moreover, disqualified himself, even though the prosecuting attorney had withdrawn his motion to disqualify, because of the publicity surrounding the case. Petitioner also observes that the assistant prosecuting attorney had, by that time, accused the Chief Judge of having breached the

confidentiality surrounding the bar grievance process.

Petitioner contends that the prosecuting attorney continued his campaign even after Judge Borsos was assigned the case. He notes that on the morning of sentencing, the prosecuting attorney filed a motion to disqualify Judge Borsos. When that motion was denied, he immediately requested Judge Borsos to refer the matter to the Chief Judge of the court. Petitioner argues that the prosecuting attorney's motive was not to gain a fair adjudication of his motion to disqualify, but rather to delay sentencing until after March 1, 1984, when sentencing guidelines for the State were scheduled to take effect. When Judge Borsos denied the motion for referral, the prosecuting attorney stated that the court had no jurisdiction to impose sentence and refused to participate further in the process. Yet, in a flagrant example of attempted prosecutorial "blackmail," he also stated that despite the court's lack of jurisdiction to sentence petitioner, he would not appeal the court's action if the sentence conformed to "his" conception of justice (whatever that might be).

Finally, petitioner argues that the prosecuting attorney continued his campaign even after Judge Borsos had imposed sentence. In support of his position, petitioner points to the prosecuting attorney's refusal to adhere to the plea agreement; to various public speeches that the chief prosecuting attorney had made attacking Judge Borsos' sentence; and to the decision of the assistant prosecuting attorney (who had breached Judge Fitzgerald's confidentiality order) to use his involvement in the case as the principal basis for his campaign for a seat on the Circuit Court.[5]

Respondent argues that no prosecutorial misconduct occurred during the sentencing process. He also asserts that petitioner

---

was certainly *not* the father of the children—it was the public, including specifically the petitioner. Whatever his reasons, they were ill advised at best, and intentionally violative of ethical standards at worst. He apparently even told the father the recommendations of the pre-sentence investigator—a matter on which he should have been ignorant by law, but if knowledgeable was required to keep confidential.

**5.** The record contains some political advertisements by this individual. While he was not elected, the campaign lends support for the argument that the Michigan process of selecting judges is too political and does not encourage independence.

has failed to demonstrate that any misconduct that may have occurred actually prejudiced him. Respondent notes that the assistant prosecuting attorney informed the victim's father of Judge Fitzgerald's proposed sentence because he believed that the victim had a right to know what was happening in the case. He also observes that the father, and not the attorney, contacted the news media with the information. Respondent in addition argues that the prosecuting attorney acted properly in requesting Judge Fitzgerald, Judge Lamb, and Judge Borsos to disqualify themselves from the case because all three Judges had joined in a grievance petition against the assistant prosecuting attorney originally assigned to the case, and Judge Fitzgerald had indicated, in an unrelated case, that he could not be impartial toward that attorney. Finally, respondent argues that the prosecuting attorney acted properly at petitioner's January 30, 1984 sentencing and in opposing implementation of the plea agreement.

▋ The standard I must apply under the due process clause in deciding petitioner's claim is whether the prosecutor's conduct in this case was "so egregious as to render" the sentencing process fundamentally unfair. *Angel v. Overberg,* 682 F.2d 605, 608 (6th Cir.1982) *(en banc)*; *see also Potts v. Zant,* 734 F.2d 526, 535 (11th Cir. 1984) (indicating this standard applies both at trial and during the sentencing phase of a case). In applying this standard, I must consider the "totality of the circumstances surrounding" the case. *Angel,* 682 F.2d at 608. In particular, I should consider the degree to which the prosecutor's misconduct may have tended to mislead the sentencer to the prejudice of petitioner; whether any misconduct that may have occurred was isolated or extensive; whether the misconduct was deliberate or accidental; and the extent to which other factors may have outweighed or diminished the effect of the misconduct. *See id.* If the petitioner received a fundamentally fair sentencing proceeding, then no due process violation occurred and I should deny his petition.

In the sentencing context, some courts have sought to refine the "fundamental fairness" standard and to provide courts with more specific guidance on how to resolve claims of prosecutorial misconduct. In particular, the Court of Appeals for the Eleventh Circuit has established the following standard for use in death penalty cases where the petitioner argues that prosecutorial misconduct during the sentencing proceeding unfairly prejudiced the jury's decision: "whether there was 'a reasonable probability that, in the absence of the offending remarks, the sentencing outcome would have been different.' " *Tucker v. Kemp,* 802 F.2d 1293, 1295 (11th Cir.1986) *(en banc)* (citation omitted). The Eleventh Circuit defines a reasonable probability as a " 'probability sufficient to undermine confidence in the outcome.' " *Id.* at 1295–96 (citation omitted). It concluded in *Tucker* that "[i]f a reviewing court is confident that, absent the improper remarks, the jury's decision would have been no different, the proceeding cannot be said to have been fundamentally unfair." *Id.* at 1296. This Circuit derived its "reasonable probability" standard from the prejudice prong of the standard for determining ineffective assistance of counsel claims, *see Strickland v. Washington,* 466 U.S. 668, 693–94, 104 S.Ct. 2052, 2067–68, 80 L.Ed.2d 674 (1984), observing that it is consistent with how other courts have implemented the fundamental fairness standard. *Brooks v. Kemp,* 762 F.2d 1383, 1400–02 (11th Cir. 1985), *vacated,* — U.S. —, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986); *see United States ex rel. Shaw v. Robertis,* 755 F.2d 1279, 1281 n. 1 (7th Cir.1985) (in a prosecutorial misconduct case, a court must examine whether the petitioner has established "that it is at least likely that the misconduct complained of affected the outcome of his trial").

I am not completely comfortable with applying the Eleventh Circuit's refinement of the fundamental fairness standard in this instance. At least two distinguishing factors from the usual death penalty context appear in this case. First, here petitioner was sentenced by a judge, not a jury. I believe that courts generally, whether justified or not, are more reluctant to find prejudicial misconduct where such misconduct occurred before a judge. Secondly, the prosecutorial misconduct that occurred

in this case occurred *outside* of the courtroom. Prosecutorial misconduct cases generally involve improper arguments before the jury, or other fact-finder, or other misconduct occurring *inside* the courtroom. In this case, by contrast, most of the conduct of which petitioner complains took place *outside* of the courtroom. These two factors suggest that I should apply a higher standard for deciding whether the prosecutor's conduct in this case deprived petitioner of his right to a fundamentally fair sentencing.

I nevertheless conclude that the Eleventh Circuit has suggested a standard that works fairly well in this context, and which I ought to follow. The standard is consistent with the general theme of prosecutorial misconduct cases that a habeas petitioner is not entitled to relief unless he can establish that the misconduct adversely affected the outcome of his trial or sentencing. I have been unable, moreover, to discover in my research a refinement of the fundamental fairness standard that would provide me with any better guidance. I do observe, and later in this opinion will discuss, some additional factors that I should consider in analyzing the rather unusual facts of this case.

Petitioner argues that the prosecutor in this case clearly engaged in significant acts of misconduct and that such acts deprived him of his constitutional right to a fundamentally fair sentencing proceeding. I believe that petitioner's claim of prosecutorial misconduct actually consists of two different and discrete elements. These elements become apparent when one remembers that the sentence petitioner is challenging is Judge Warren's sentence. Petitioner's first argument is that Judge Warren's sentence was itself infected by prosecutorial misconduct and thus violated petitioner's due process rights. Petitioner's second, and distinct, argument is that the prosecutor's misconduct deprived him of the sentence that Judge Fitzgerald would have imposed, and thus changed the outcome of the sentencing proceeding. In its simplest terms, petitioner's argument is that "but for" the prosecutor's misconduct, he would have received a five year sentence of probation, without the requirement that he submit to treatment with Depo-Provera, and that it is only because of such misconduct that he received instead a sentence of five to fifteen years imprisonment.

■■■ I reject petitioner's first argument, and find that Judge Warren imposed a fair and impartial sentence on petitioner. Petitioner states in his brief that although he does not argue that "the sentencing judge was necessarily biased due to the numerous acts of misconduct by the prosecutor," he does contend that "the misconduct created such an air of partiality and prejudice against petitioner that the whole series of proceedings were hopelessly tainted by the public sensationalism." *Brief in Support of Petition for Writ of Habeas Corpus* at 27. I do not believe that the record—even accepting petitioner's factual allegations as true—would support a finding that petitioner's sentencing proceeding was "hopelessly tainted by the public sensationalism." I have reviewed the transcript of Judge Warren's sentencing and find nothing to indicate that he was either biased against petitioner or affected by the publicity surrounding the case, or that he failed to consider the full range of sentencing alternatives available to him. I was particularly impressed by Judge Warren's statement that, without exception, he read no written communications on the case except those that came from the parties, the probation officer, and the court administrator. Transcript of September 21, 1984 Motion and Sentence at 7.

Petitioner has pointed the Court to few, if any, facts that would support a finding that Judge Warren did not sentence petitioner in a fair and impartial manner. I do not believe that the events concerning petitioner's case were so unique or prejudicial to him that the Court must presume bias or must find that once the assistant prosecuting attorney informed the victim's father of Judge Fitzgerald's proposed sentence, a fair and impartial sentencing was impossible. *Compare People v. Morris*, 77 Mich. App. 561, 258 N.W.2d 559 (1977) (prosecution dismissed where police misconduct was "so egregious and tenacious that even the

good faith efforts of the prosecutor's office were unable to control it").

I do not, moreover, find any evidence that Judge Warren was actually biased toward petitioner. Much of the misconduct of which petitioner complains occurred in the fall of 1983 and the spring of 1984; well before Judge Warren's September 21, 1984 sentence. Even accepting petitioner's allegations regarding the prosecutor's conduct as true, the Court has no basis for finding that either the assistant prosecuting attorney's breach of Judge Fitzgerald's confidentiality order, the motions to disqualify the Circuit Court Judges, the prosecuting attorney's conduct at the January 30, 1984 sentencing, or the prosecuting attorney's post-sentencing conduct affected Judge Warren's decision. Finally, Judge Warren was an experienced visiting judge, from outside of Kalamazoo County, who had little reason to be frightened of his image before the voters and had no apparent reason to feel influenced by the notoriety of the case.

For these reasons, I find that petitioner has failed to establish either that Judge Warren did not provide him a fair and impartial sentencing, or that the prosecutor's misconduct was sufficiently prejudicial to render a fair and impartial sentencing impossible. In terms of the Eleventh Circuit's standard, I do not find a reasonable probability that in the absence of the prosecutor's misconduct, Judge Warren's sentence would have been different.

Petitioner's second argument—the second element of his prosecutorial misconduct claim—is more difficult to decide. Although petitioner does not explicitly raise this argument in his briefs, I believe that it is sufficiently implied to require discussion. Petitioner contends that if the prosecutor's misconduct had not occurred, he probably would have received a sentence of probation. He supports this contention with an affidavit from his attorney indicating that Judge Fitzgerald intended to impose a sentence of probation on petitioner on October 18, 1983, but adjourned sentencing to allow petitioner "time to make initial arrangements to meet his conditions of probation." Fette Affidavit, ¶ 8. He reasons that the prosecutorial misconduct created a situa-tion whereby Judge Warren could not even consider a sentence of probation, and thus concludes that such misconduct "undeniably" altered the outcome of his sentencing proceeding. Petitioner suggests as a remedy that the Court require the State to resentence him, but limit the sentence to one no more severe "either in length, type or nature ... or conditions of probation" than the one Judge Fitzgerald had communicated to him.

 This issue is difficult to decide because it fits within none of the case law the parties have cited in their briefs or the Court has researched on its own. It involves, moreover, what in essence was a nonsentence. Judge Fitzgerald never sentenced petitioner, which makes it difficult for the Court to determine whether there is a reasonable probability that the prosecutor's misconduct led to a different sentencing outcome. In analyzing this kind of claim, where a sentence is suggested but never imposed, I believe a court should look at three factors: (1) the strength and legitimacy of the petitioner's expectation in receiving the suggested sentence; (2) the nature of the prosecutorial misconduct that disrupted the sentencing process; and (3) the strength of the nexus between that misconduct and petitioner's failure to receive his "expected" sentence.

A brief hypothetical example will illustrate the application of these three factors. In my judicial imagination, the judge enters the courtroom and, after some preliminary remarks, announces that he intends to sentence the defendant to a five-year term of probation but first wishes to explain his reasons for the sentence. The prosecuting attorney immediately interrupts and states that if the judge imposes that sentence, he, the prosecuting attorney, will immediately seek to recall the judge from office and will request the appropriate state agency to investigate the judge's fitness to continue in office. The judge listens to further argument from both sides and ultimately sentences defendant to a ten or fifteen year term of incarceration.

The defendant in this situation had a strong, legitimate expectation that he

would be sentenced to five years probation. The prosecutorial misconduct clearly was intentional, blatant, and egregious. Finally, a reviewing court probably would feel comfortable concluding that there was a strong nexus between the prosecutor's misconduct and the judge's decision to change the defendant's sentence.[6]

 · The hypothetical, however, is not this case. This Court would have to engage in sheer speculation to find the requisite probability that in the absence of the prosecutor's misconduct, Judge Fitzgerald would have sentenced petitioner to a term of probation, and that such misconduct thus altered the outcome of petitioner's sentencing. The first part of my three-part standard is the most critical in this instance. I do not believe that petitioner had a strong, legitimate expectation in receiving a probationary sentence from Judge Fitzgerald. I note that following the parties' October 18th conference, Judge Fitzgerald stated on the record that he had "shared with counsel what its *inclination* is" regarding sentencing, but obviously had *"not pronounced the sentence"*. *Gauntlett I*, 134 Mich.App. at 741, 352 N.W.2d 310 (emphases supplied). Later, in his disqualification opinion, Judge Fitzgerald stated that he had held a "presentence conference" on the 18th; that at this conference, he had discussed with counsel *"a proposed sentence plan"*; that what he had announced in chambers was a *"contemplated sentence plan"*; and that because of the publicity about the case, he could "no longer consider *appropriate sentencing alternatives"* for if he "were to change or deviate from the sentencing plan initially indicated in any way" its validity would be suspect. Transcript of November 16, 1983

Opinion at 5–6 (emphases supplied). Judge Fitzgerald further observed in his opinion that if he "were to steadfastly adhere to the sentence plan initially contemplated, all parties, the prosecution and the defense, would be denied the legitimate consideration of and reflection upon *all other viable sentencing alternatives." Id.* at 6–7 (emphasis supplied)[7].

These comments indicate that Judge Fitzgerald had not, as petitioner argues, definitely decided on a probationary sentence, but rather was keeping his sentencing options open. Any expectation petitioner may have had in receiving a probationary sentence from Judge Fitzgerald was not legitimate, particularly since Judge Fitzgerald had adjourned sentencing for approximately six weeks. There are a number of things, unrelated to any misconduct by the prosecutor, that could have occurred during that time that would have convinced Judge Fitzgerald to impose a different sentence. For this same reason, any legitimate expectation petitioner may have had in receiving a probationary sentence was not strong.

Given this analysis of the first factor, the remaining two factors are easily disposed of. The only acts of alleged prosecutorial misconduct that could have affected Judge Fitzgerald's proposed sentence were the assistant prosecuting attorney's disclosure of information to the victim's father and the attorney's decision to file a motion to disqualify Judge Fitzgerald. I believe that the first action did constitute an act of misconduct. The assistant prosecuting attorney disclosed information concerning the proposed sentence in violation of Judge Fitzgerald's order, and probably also in vio-

---

**6.** Even here the reviewing court is required to "speculate." Did the judge alter the sentence because of the fear he/she encountered with the prosecutor's remarks? Or was the court undecided *until* the moment of the actual sentence and uninfluenced by the "threats"? It is the "but for the prosecutorial misconduct" speculation that is disturbing. How can one know? Removal of the trier or the sentencer obviates the need to speculate. This is what happened here. All the judges who might have been influenced were gone for one reason or the other. Judge Warren, insulated from threat, intervened. That intervention removed the cloud

created by the prosecutorial thunder and lightning. And that is the whole point.

**7.** And this, of course, is the ethical and legal requirement imposed on all trial judges. We are always challenged (and should be) to consider *all* viable alternatives before finally imposing sentence. Even after preliminary conclusions have been reached, the arguments of the lawyers, the allocution of the defendant or some other matter may occur in the courtroom itself that cause a judge to reconsider an earlier conclusion. Judge Fitzgerald, I think, recognized these options in his disqualification remarks.

lation of Disciplinary Rule 7–107(E), which provides that before sentencing, an attorney "associated with the prosecution ... shall not make or participate in making an extra-judicial statement that a reasonable person would expect to be disseminated by public communication and that is reasonably likely to affect the imposition of sentence."

I do not, however, find that misconduct to have been particularly egregious. The assistant prosecuting attorney clearly misunderstood his role as a prosecutor in believing that the victim's father was a client to whom he could freely disclose information. The prosecutor's obligation is to the public and to do justice in the case before him for the public, the victim, and the defendant. This is not a situation, however, where the prosecutor communicated the proposed sentence directly to the media or otherwise openly lobbied against the sentence. The Court does not, moreover, find any evidence that the assistant prosecuting attorney acted improperly in requesting Judge Fitzgerald to disqualify himself from the case. Beyond the fact that the prosecutor's motion had no affect on Judge Fitzgerald's decision to disqualify himself, his motion was proper given that Judge Fitzgerald had filed a grievance against him.

Finally, the Court finds at best only a weak nexus between the prosecutorial misconduct and petitioner's failure to have received a sentence of probation. I acknowledge that the assistant prosecuting attorney's breach of Judge Fitzgerald's confidentiality order was a direct cause, in a "but for" sense, of the publicity surrounding petitioner's sentence and that Judge Fitzgerald disqualified himself because the intense publicity made it impossible for him to sentence petitioner fairly·and impartially. Petitioner's claim fails, however, for the reasons I stated in discussing the first prong of this test. I have an insufficient basis for finding that Judge Fitzgerald *probably* would have imposed a probationary sentence on petitioner even if he had not been required to disqualify himself.

For the above reasons, I reject petitioner's claim that the prosecutorial misconduct that occurred in this case altered the out-

come of his sentencing proceeding. I do not believe he has sufficiently demonstrated that, absent the prosecutor's misconduct, Judge Fitzgerald would have imposed a sentence of probation. As I discussed previously, moreover, I find that Judge Warren's sentence was unaffected by any misconduct. Petitioner received a fair and impartial sentencing before Judge Warren.

 This latter ruling also provides the basis for an alternative holding on the second element of petitioner's prosecutorial misconduct claim. Specifically, even if I had found that the prosecutor's misconduct had unfairly deprived petitioner of a probationary sentence, petitioner has already received an appropriate remedy for that claimed constitutional violation: a resentencing before a fair and impartial sentencer. The general remedy for a constitutional violation in a sentencing proceeding is to return the case to the appropriate trial court for resentencing. *See Cabana v. Bullock,* 474 U.S. 376, ——, 106 S.Ct. 689, 700, 88 L.Ed.2d 704, 720 (1986); *see also Fisher v. Rose,* 757 F.2d 789, 791 (6th Cir. 1985) (a conditional grant of a writ of habeas corpus does not preclude a state "from rearresting petitioner and retrying him under the same indictment").

In a real sense, Judge Fitzgerald protected petitioner's constitutional rights in this case by disqualifying himself. Petitioner's case would be much stronger if Judge Fitzgerald had remained in the case and had imposed a substantial term of imprisonment on petitioner. By disqualifying himself, however, Judge Fitzgerald cleared the way for the appropriate remedy for this sorry situation: a new sentencing proceeding before a fair and impartial sentencer. There thus is no remedy this Court could impose that petitioner has not already received. I decline petitioner's suggestion that I require the State to resentence him to a sentence no more severe than that Judge Fitzgerald had contemplated in chambers on October 18, 1983.) Petitioner's suggested remedy may be appropriate in a case of egregious misconduct that directly affected the sentencing outcome. This was not such a case, however.

For the above reasons, I reject petitioner's claim that prosecutorial misconduct deprived him of a fair sentencing, while, at the same time, not condoning that conduct. The prosecutors involved in this case did not live up to the high ethical standards of conduct to which they are expected to adhere. They seemed to lose sight of the fact that their function is not "to tack as many skins of victims as possible to the wall" but rather "to vindicate the right of people as expressed in the laws and give those accused of crime a fair trial," and a fair sentencing. *Donnelly v. DeChristoforo,* 416 U.S. 637, 648–49, 94 S.Ct. 1868, 1873–74, 40 L.Ed.2d 431 (1974) (Douglas, J., dissenting). As is often stated in the case law, however, not all cases of misconduct constitute unconstitutional misconduct. This is one of those cases where the prosecutors' conduct, although improper, in the end did not deprive petitioner of his constitutional right to a fundamentally fair sentencing.

### Conclusion

Finally, as we approach Law Day 1987, it may be appropriate to recall what it is we celebrate: a rule of law and not the rule of a monarch. Four and one half years have elapsed since petitioner was first charged with the offenses which give rise to this proceeding. Four trial judges were assigned a sentencing responsibility. Two appeals have been processed all the way through the Michigan appellate system. The first federal proceeding is now completed, and there may well be further appeals. There have been, it is clear, more than a few "victims," and no clear "winners" in this lengthy process.

Critics of our judicial system rightfully object to the delays which usually accompany litigation, civil or criminal, and ask "when does a case ever end?" "When does finality attach?" "Where is the certainty the law should render?" There may well be a better way, and our courts and legislatures are busily engaged in trying to discover it.

Until they do, however, we should all strive to see that justice is just that—justice. And we can be rightfully proud, in this the year we celebrate two hundred years of constitutional governance, that the rule of law still reigns supreme in our country. Indeed, the very delays about which we complain are caused by our concern that fundamental fairness be the root and branch of our legal system. Has any other country ever struggled so long and so hard for such a noble principle? The "one shining moment" King Arthur eulogized has really been ours for two hundred years. The "winner," then, is all of us.

In the instant case, this Court will issue an order denying the issuance of the writ sought by petitioner.